DORON WEINBERG (SBN 46131)
LAW OFFICES OF DORON WEINBERG
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile:  (415) 552-2703
Email: doronweinberg@aol.com

Attorney for Defendant
RICHARD W. NORTHCUTT

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CASE NO. 2:11-CR-00038 WBS** |
| | ) | |
| Plaintiff, | ) | **DEFENDANT RICHARD W. NORTHCUTT'S SENTENCING MEMORANDUM** |
| | ) | |
| vs. | ) | |
| | ) | |
| RICHARD W. NORTHCUTT, et. al., | ) | |
| | ) | DATE: September 12, 2016 |
| Defendants. | ) | TIME: 9:00 A.M. |
| | ) | JUDGE: Hon. William B. Shubb |
| _____ | ) | COURT: 5, 14th Floor |

## INTRODUCTION

In the fall of 2009 several participants in foreclosure auctions at the San Joaquin County courthouse became aware that the FBI was investigating their activities, following allegations that the participants were entering into agreements to restrain bidding in public auctions, and were holding private secondary auctions at which additional sums were exchanged among the participants for the right to purchase properties.

In response, three participants, Anthony Ghio, John Vanzetti and Theodore Hutz, through counsel, approached the government and reached agreements to plead to charges of bid-rigging under Title 15 and to cooperate in the investigation.  Ghio entered his plea in April 2010;

---

Defendant Richard W. Northcutt's Objections to
Presentence Report (Case No. 2:11-CR-00038 WBS)       1

1  Vanzetti and Hutz entered theirs in June 2010.

2        Richard Northcutt, also acting through counsel, contacted the government in December
3  2009 offering to resolve his case and to cooperate, but was informed that the government was not
4  ready to meet with him.

5        Several months passed before the government agreed to meet with Richard Northcutt and
6  his counsel, at which time it was announced that the Antitrust Division had adopted a policy of
7  requiring defendants in foreclosure auction cases to plead guilty not just to bid-rigging but also to
8  mail fraud and, moreover, to stipulate to the application of the Sentencing Guidelines for fraud.
9  Although he and his counsel recognized that there was a substantial question of the applicability
10 of the fraud guidelines to a bid-rigging conspiracy,[1] Richard Northcutt did not wish to prolong
11 his case and had no interest in litigating legal issues.  He simply wanted to accept responsibility
12 and the consequences of his conduct, and move forward with his life.  With advice of counsel he
13 also trusted that, pursuant to 18 U.S.C. § 3553, an appropriate and fair sentence would be
14 imposed. Accordingly, Richard Northcutt pleaded guilty to mail fraud and stipulated to the
15 application of mail fraud guidelines which, the government agreed, would yield a sentence in the
16 range of 30 to 37 months prior to the consideration of § 3553 factors and a potential departure
17 under U.S.S.G. § 5K1.1.

18       Richard Northcutt stands behind his plea and stipulation and requests that this Court use
19 as its starting point the guideline range agreed to by the parties in the plea agreement reached
20 more than five and-a-half years ago, and reject the unwarranted and unduly punitive upward
21 adjustments proposed by the Presentence Investigation Report.

---

[1] See footnote 2, infra.

I. **THE DETERMINATION OF DEFENDANT NORTHCUTT'S SENTENCE SHOULD BEGIN WITH THE GUIDELINE CALCULATIONS PROPOSED IN THE PLEA AGREEMENT, AND THEN BE ADJUSTED DOWNWARD UPON CONSIDERATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) AND THE PROVISIONS OF U.S.S.G § 5K1.1.**

   A.   **The Guidelines Calculation.**

In reaching the plea agreement filed in this matter in January 2011 the parties carefully considered the relevant facts and circumstances and balanced competing interests. The parties agreed that defendant Northcutt was responsible for restitution in the amount of $349.260.00 and a fine in the amount of $20,000, had acted in a supervisory or managerial role in the criminal conduct, and had fully accepted responsibility. This resulted in a Total Offenses Level of 19 and sentencing range of 30 to 37 months, under the advisory Sentencing Guidelines.

The Presentence Investigation Report ("PSR") rejects the parties' agreement and calculations, proposes a Total Offense Level of 24 and recommends a sentence of 51 months, a fine of $309,497.00 and restitution to be determined.

The PSR's 5-level increase in Total Offense Level is based on three factors: a calculation of the loss attributable to defendant Northcutt as $614,982.00, rather than $349,260.00; a classification of defendant Northcutt as an organizer or leader of the criminal activity rather than a supervisor or manager; and the addition of a 2-level enhancement for the number of victims involved. The recommended fine is apparently based on the probation office's calculation of 2.5% of the volume of commerce involved in the case.

The upward adjustments recommended by the PSR are unwarranted; this Court should employ the advisory guideline calculations recommended by the parties as the starting point for its determination of the sentence to be imposed herein.

---
Defendant Richard W. Northcutt's Objections to
Presentence Report (Case No. 2:11-CR-00038 WBS)      3

1.    <u>Loss Amount</u>.

After careful calculation and negotiation, the parties agreed in 2011 that the loss attributable to defendant Northcutt is $349,260.00, which would support a 12 level increase under U.S.S.G. § 2B1.1(b)(1)(G).  The PSR now asserts that defendant Northcutt received $614,982.60, without specifying any basis for this calculation.  It appears, however, that the government has determined that its earlier calculations may have been incomplete and new calculations may bring the loss figure closer to that contained in the PSR. Since the upper limit of Specific Offense Characteristic § 2B1.1(b)(1)(G) is $550,000, based on the higher calculation the PSR recommends an increase of 14 levels.

Defendant submits that an increase of 12, rather than 14-levels is appropriate for two reasons: first, the plea agreement specifically incorporated the government's representation that the loss figure and the resultant sentence would be based on the lower amount and the government agrees that fairness demands that the amount not be retroactively changed to defendant's detriment. Second, whereas the lower limit for the 14-level adjustment of § 2B1.1(b)(1)(H) is $550,000, its upper limit is $1,500,000.  Thus, the amount of loss attributable to defendant Northcutt under the revised calculations is minimally – less than 7% – above the threshold.  Under the circumstances, the addition of 2 levels is not only unfair but unwarranted.

2.    <u>Aggravating Role</u>.

The parties agreed that defendant played a managerial or supervisory role in the criminal conduct, largely because he coordinated a significant part of the group's activities.  He did not, however, play the role of organizer or leader.  Accordingly, the parties concurred that an adjustment of 3 levels, rather than 4, is appropriate.

Without any reference to the parties' agreement, the PSR recommends that defendant Northcutt be treated as an organizer or leader and the adjustment for his role should be 4 levels.

---

Defendant Richard W. Northcutt's Objections to
Presentence Report (Case No. 2:11-CR-00038 WBS)      4

1   The PSR provides only two skeletal statements in support of this conclusion. First it asserts that
2   he "has been identified as an organizer or leader" of the activity, without any indication of who
3   made such an identification or on what basis.  It then asserts "specifically, Northcutt handled the
4   finances and paperwork for their business and acted as the banker.  He also acted as the banker
5   for Katakis and settled up with Katakis via Ken Swanger." (PSR, ¶ 55).

6   Plainly, these specifics do not support a 4-level adjustment for role in the offense. The
7   conduct attributed to defendant is wholly consistent with the activities of a manager or
8   supervisor, rather than an organizer or leader, and inconsistent with the factors suggesting
9   leadership as articulated in Application Note 4 to U.S.S.G. § 3B1.1.  Defendant Northcutt did not
10  exercise decision making authority, did not claim the right to a larger share of the fruits of the
11  crime, and did not exercise control or authority over the others involved. All of the defendants
12  were independent, experienced and sophisticated businessmen pursuing their own separate
13  interests, and were not directed or controlled by Richard Northcutt.

### 3. Number of Victims.

15  The PSR proposes a 2-level adjustment for the number of victims of defendant's conduct.
16  This is not an adjustment recommended by the parties, and is fundamentally misconceived.

17  The adjustment for number of victims is an element of the guidelines for fraud and theft
18  offenses.  It is logically relevant where a defendant has victimized a number of individuals or
19  institutions by misappropriating their property. The instant case, as will be more fully discussed
20  in the next portion of this memorandum, is not a typical fraud and the adjustment for number of
21  victims does not fit.  Here, defendant and those with whom he acted did not take or
22  misappropriate anything that was in the possession of or owed to the owners; they paid exactly
23  what the property owners demanded in order to obtain the property. What they didn't do was pay
24  the owners any more than the owners had demanded, and thus they limited the amount of money

that the property owners received.

This is, of course, the essence of bid-rigging, and is the difference between bid-rigging and fraud. Defendant recognizes that by virtue of his plea agreement he admitted culpability for fraud, but in doing so he did not change the nature of his conduct. An enhancement for number of victims is not applicable to the offense of bid-rigging, and should not be imported into a case involving conduct that is essentially bid-rigging, notwithstanding that it was charged as fraud.[2]

4.  Fine.

As part of their agreement, the parties proposed that defendant be fined in the total amount of $20,000.00.  Ignoring this agreement, the PSR recommends a fine of $309,497.00 in addition to the restitution figure which is yet to be determined but will be at least $349,260.00.

This again is inappropriate, not only because it exceeds and undermines the agreement made by the parties, but also because it punishes defendant doubly.

In reaching the plea agreement, defendant agreed to pay restitution as though he committed a typical fraud offense, even though restitution is not usually attendant to bid-rigging convictions. In return, the government agreed to recommend a minimal fine of $20,000.00 under the bid-rigging Guidelines.  The PSR ignores this balancing and accommodation by the parties,

---

[2] It should be noted that U.S.S.G. § 2B1.1(c)(3), as it read in 2011, provided that, with certain exceptions, where a "defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally . . . and . . . the conduct set forth in the count of conviction establishes an offense specifically covered by another Guideline in Chapter 2 (Offense Conduct), apply that other Guideline." An argument can be made that, notwithstanding his fraud conviction, defendant should be sentenced under U.S.S.G. § 2R1.1, which applies to bid-rigging and price fixing, and for which the Guideline calculations would be significantly lower than for fraud. See, *United States v. Rubin*, 999 F.2d 194, 198 (7th Cir. 1993); *United States v. Davis*, 304 F.App'x 473 (9th Cir. 2008); *cf, United States v. Anderson*, 326 F.3d 1319 (11th Cir. 2003).   Defendant does not make that argument, and recognizes that the argument was expressly waived by his agreement to plead to fraud and accept fraud guidelines, but it was with the understanding that enhancements applicable only to fraud, such as the number of victims, would not also be imported into his sentencing.

---

Defendant Richard W. Northcutt's Objections to
Presentence Report (Case No. 2:11-CR-00038 WBS)      6

and recommends that defendant suffer substantial financial penalties on each count, as though they were separate rather than overlapping offenses. The result is double punishment that is both unfair and unwarranted.

Defendant respectfully submits that none of the upward adjustments suggested by the PSR are appropriate and that the Guidelines calculations agreed to by the parties should be the starting point for the Court's consideration of the advisory sentencing guidelines.

**B.    The Factors Set Out in 18 U.S.C. § 3553 Establish That Defendant Northcutt Is Entitled To A Sentence Substantially Below The Guideline Range.**

It should be noted at the outset that in agreeing that fraud guidelines should be applied in this case, both the government and the defendant contemplated that this would be only the beginning of the determination of defendant's sentence. The government not only agreed, as it must, that consideration of the factors under 18 U.S.C. § 3553(a) are to be included, but also expressly recognized that defendant's agreement to the application of fraud guidelines in his case raised equitable issues which he could bring forth.

As this Court well knows, under 18 U.S.C. § 3553(a) the court is directed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [the statute]." In doing so, the court is directed to consider certain factors all of which, when fully considered on the record of this case, point strongly to the propriety of a sentence well below the advisory guideline range of 30 to 37 months.

1.    <u>The Nature and Circumstances of The Offense</u>.

There are at least three major grounds on which defendant's defense conduct differs significantly from – and merits a substantially less punitive response than – a typical fraud:

First, the conduct upon which the fraud charge is based is essentially the culmination of a bid-rigging conspiracy, which is the principal offense and which carries significantly lesser

penalties than fraud.

Second, defendant and his confederates did not misappropriate or steal anyone's property; they paid the property owners what the owners demanded, but took collusive steps to avoid paying more.

Third, the property "owners" to whom defendants did not pay additional sums were hardly vulnerable victims; they were in fact institutions and businesses that were perpetrators or successors-in-interest to the perpetrators of a massive pattern of predatory lending that injured millions of lower and middle income homeowners and brought on the collapse of the mortgage market.

With regard to the first of these points, it should be noted that three of the actors involved in defendant's conduct, including particularly Anthony Ghio who was centrally involved in the criminal conduct, were allowed to plead only to bid-rigging charges and therefore to be sentenced only under bid-rigging guidelines.[3]

With regard to the second issue, there are two additional considerations beyond the fact that the defendants did not misappropriate money or property from the lenders. The reality is that in many cases, if the defendants had not bid on the properties, the banks would have received

---

[3] It is also noteworthy that on August 15, 2016, Chief Judge Phyllis J. Hamilton of the Northern District of California issued an order dismissing all mail fraud charges in a case involving bid-rigging at foreclosure auctions in Contra Costa county. Although the Indictment in that case was couched differently from the Indictment in this case, the essence of Judge Hamilton's order was that the mail fraud charges could not stand independently of the bid-rigging conspiracy. *United States v. Galloway, et. al.* (Northern District of California Case No. CR-14-0607 PJH, Dkt. 139).

In response to Judge Hamilton's ruling, the Antitrust Division has agreed to dismiss mail fraud charges against 8 additional defendants whose trials are pending, and also to allow 37 defendants who have entered guilty pleas to mail fraud before Judge Hamilton to withdraw their guilty pleas. Accordingly, the Antitrust Division will proceed against all defendants *only* on bid-rigging charges.

---

Defendant Richard W. Northcutt's Objections to
Presentence Report (Case No. 2:11-CR-00038 WBS)     8

nothing for them, rather than receiving the minimum that they had established as sufficient to justify parting with the property.

Further, the basis for the operative calculation of loss, upon which defendant's sentence hinges, is in fact quite speculative. It is the government's *theory* that the monies exchanged by the defendants at the secondary auctions would have been available to the lenders if all bidding had occurred at the public auction. In fact, however, many of the bids made at the secondary private auctions would not have been made at a public auction, and the resultant purchase price at completely transparent public auctions would not necessarily have been as high as those bid at the private auctions. This is because the only reason to bid at a transparent public auction is to become the purchaser of the property in question. In contrast, the participants in private auctions distributed among themselves the sums bid that were in addition to the public purchase price, based on participation in the private auction. Thus, participants in the private auctions had a second motive to bid – by making a bid at the private auction they assured that they would receive a distribution, and thus might be impelled to make bids that they would not make at a public auction.

The third consideration, the status of the "victim" lenders, is particularly significant. It was in fact the "victims" and their predecessors in interest who created the circumstances that made the defendants' offenses possible.

As is well known, between 2005 and 2007 major financial institutions, such as Lehman Brothers, Merrill Lynch, JP Morgan Chase and Citigroup, principally through their subsidiaries, made millions of high interest, or "subprime," loans to borrowers who were not qualified for them and could not repay them, but were charged a rate higher than the prime rate. These risky mortgages were passed on to financial engineers at the big banks, who turned them into supposedly low-risk securities by putting large numbers of them together in pools. The pooled

Defendant Richard W. Northcutt's Objections to
Presentence Report (Case No. 2:11-CR-00038 WBS)     9

mortgages were used to back securities known as collateral debt obligations, which were then sliced into tranches and sold to investors, also largely institutional, as triple-A rated securities, but in fact were almost worthless. Then when, inevitably, millions of subprime borrowers could not meet their debt obligations, the entire construct collapsed, most literally in the case of Lehman Brothers, and almost took the world financial system with it.

The response of the U.S. government was focused principally on rescuing the major lenders, rather than their victimized borrowers, with billions of dollars in bailout funds. What the government did not do, as is well known, was to call to account, let alone prosecute, the perpetrators of this devastation. Instead, the people prosecuted were those who caused the lenders themselves to lose money or prevented them from making more – the borrowers who were enticed to falsify their loan applications, the brokers and lender representatives who helped them do so and the foreclosure auction participants who entered into agreements that withheld from the lenders any more money than they demanded.[4]

### 2. The History and Characteristics of the Defendant.

The PSR inexplicably asserts that "[t]he probation officer has not identified any factors that would warrant a sentence outside the advisory guideline system" regarding the history and characteristics of defendant Richard Northcutt. It appears that in reaching this conclusion the probation officer failed to take into account information contained in the PSR itself, and also

---

[4] It should be emphasized, as the PSR notes, that the victims in this case were solely the institutional lenders who speculated in the real estate market and not the distressed homeowners who lost their property to foreclosure. Of course, the mortgage loans had been defaulted, and the properties were foreclosed upon, well before any involvement by the participants at the foreclosure auctions. And the restraint of bidding at the auctions had virtually no impact on the homeowners because, particularly in 2008 and 2009, the housing market had become so depressed and the banks' minimum bids were so low that even in the most transparent auction the winning bid would almost never be high enough to cover the outstanding debt, let alone leave a surplus for the homeowner.

---

ignored the letters submitted on defendant's behalf.

The PSR recites the unusually traumatic circumstances of defendant Northcutt's upbringing, but does so in a detached, clinical manner that does not recognize the enormous impact of the events.

Richard Northcutt was born into a dysfunctional family; his father was repeatedly abusive to his mother, which led his mother to stab his father to death when Richard was 7 years old. He and his two siblings were then shuffled between children's homes and the home of his grandparents while his mother was tried, convicted and sentenced to serve a year for manslaughter.  Significantly, Richard had to testify as a primary witness at his mother's trial.

When Richard was 13 his mother remarried, and her new husband was physically abusive to Richard and his siblings.  Richard himself began to use alcohol at age 16; his younger brother and sister struggled with drug addiction their entire lives. Richard's sister died of a drug overdose in 2003; his brother in 2011.

With remarkable fortitude and resoluteness Richard overcame the challenges that his childhood had put before him.  He resisted dependence on alcohol and drugs, and did all he could to try to help and support his siblings. As he saw it, that was his obligation and he was committed to fulfilling it.

Richard attended college and earned an AA degree. He received a real estate associate license in January 1977, and since 1979 he has worked as a self-employed real estate investor purchasing properties, rehabilitating them and selling them through agents and brokers with whom he was associated.  As reflected in the letters of support submitted to the Court, Richard is highly respected in the business community for his skill, responsibility and integrity.

Also as reflected in the letters of support, Richard has played an active role in the life of his community, and has been a strong supporter of its civic and charitable organizations and

causes. Fortunately, as well, he has been able to move beyond the dysfunction of his childhood and establish a loving, supportive family with his wife Louise and his stepson Max.

### 3. The Purposes of Sentencing.

Consideration of the purposes of sentencing set out in § 3553(a)(2) further supports the conclusion that Richard Northcutt's sentence should be substantially below the mail fraud guidelines set out in the plea agreement. As noted, the application of the mail fraud guidelines actually overstates the seriousness of the offense and imposes undue punishment, because the essence of the offense is bid-rigging not fraud. Accordingly, a sentence below the fraud guidelines is also sufficient to provide general deterrence for the commission of similar criminal conduct.

Even more clearly, significant punishment is not required to protect the public from further crimes by Richard Northcutt, nor does he require rehabilitative or correctional treatment.

In this connection, it should be noted that the prosecution in this matter began almost seven years ago, in the fall of 2009. During this entire period Richard Northcutt has not only been subject to monitoring and scrutiny but, as reflected in the letter of his treating therapist Peter Sheppard, he has suffered substantially from the stress, embarrassment and uncertainty of the pending prosecution.

### 4. The Need to Avoid Unwarranted Sentence Disparities.

§ 3553(a)(6) provides that in determining a particular sentence to be imposed, the Court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Although defendant does not know what sentences the Court will impose on his co-defendants in this matter, it is significant that at least three of the people who participated fully with Richard Northcutt in the offense conduct, including one who is identified in the PSR as a

leader in the conspiracy (¶ 14), were permitted to plead only to bid-rigging, and are thus subject only to big-rigging sentences. Were the bid-rigging guidelines applied to Richard Northcutt's conduct, his Total Offense Level would be at least 2 levels lower than the Level 19 upon which the plea agreement is based, and 7 levels lower than that recommended by the PSR. The sentence range would be 24 to 30 months, as opposed to the 51 to 63 months recommended by the PSR.

Also, as noted above (Fn.4), Chief Judge Phyllis J. Hamilton of the Northern District recently dismissed charges of mail fraud based on bid-rigging at foreclosure auctions. In response, the San Francisco Office of the Antitrust Division, which is also prosecuting the instant case, has decided not only to forego the pending fraud charges, but has offered all defendants in that and related matters, including at least 37 who had already pleaded guilty to fraud, to plead and be sentenced only on bid-rigging.

In sum, it is clear that the factors to be considered under § 3553 demonstrate that Richard Northcutt's sentence should be substantially lower than that suggested in the plea agreement as well as the range for bid-rigging under U.S.S.G. § 2R1.1.

**C.    Richard Northcutt Should Receive An Additional And Substantial Reduction Of His Sentence Pursuant to U.S.S.G. § 5K1.1 For His Extensive And Significant Assistance To The Government.**

The Court is, of course, aware that Richard Northcutt has cooperated fully with the government and provided substantial assistance to the prosecution.

As noted, he indicated a willingness to cooperate and assist the government within a few weeks of learning of the investigation that led to his prosecution. After having to wait a year, he agreed to plead guilty on the terms set by the government, and to cooperate fully.

To fulfill his commitment, Richard Northcutt met frequently, and at considerable length, with the government, provided all the records that were requested, and reviewed thousands of

pages of evidence to help the government identify key documents and their import.

In addition, he testified at the trial of defendants Katakis and Parker, helping the government to secure their convictions. He then made himself available to testify again in the post-trial proceedings generated by Mr. Katakis.

In all of his testimony, as in all of his dealings with the government, Richard Northcutt has been completely forthcoming, cooperative and truthful.

The government has given consideration to Richard Northcutt's extensive cooperation and assistance, and the government is recommending a reduction of his sentence, the extent of which is not known at this writing. Given the quality and scope of his assistance, it is hoped that the government will recommend a substantial reduction of the sentence that is determined following the consideration of the § 3553 factors.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, defendant Richard Northcutt respectfully requests that the Court sentence him pursuant to the following calculations, adjustments and departures.

The appropriate starting point for calculations is the advisory guideline level of 19, as set forth in the plea agreement, yielding a guideline range of 30 to 37 months. Defendant is eligible for a sentence at the low end – 30 months – and no reason exists for a sentence exceeding that length.

Then, based on § 3553(a) factors, and particularly the nature of the offense, defendant respectfully requests that the guideline range be adjusted downward to Level 17, which level reflects the sentence range for bid-rigging, with an upward adjustment of 3 levels for supervisory role and a downward adjustment of 3 levels for acceptance of responsibility. This yields a sentence range of 24 to 30 months, within which defendant would qualify for sentencing at the low end of 24 months.

Finally, pursuant to U.S.S.G. § 5K1.1, defendant believes that a reduction in the Offense Level great enough to permit a non-custodial sentence would allow the Court to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of § 3553, particularly in light of the fact defendant has been under prosecution for seven years, and has been cooperating for six years, and has demonstrated his remorse, rehabilitation and suitability for probation.

If, however, the Court believes that a custodial sentence is warranted, defendant respectfully requests that the Court grant a reduction of 50%, by lowering his Offense Level to 13, which would allow the imposition of a split sentence of 12 months, six months in prison and six months in home detention.[5]

Dated: September 6, 2016                    Respectfully submitted,

                                            LAW OFFICES OF DORON WEINBERG


                                             /s/ Doron Weinberg
                                            DORON WEINBERG
                                            Attorney for Defendant
                                            RICHARD NORTHCUTT

---

[5] Defendant also respectfully requests that the Court accept the terms of the plea agreement and impose a fine in the amount of $20,000 and require restitution in the amount not to exceed $349,260.00.